UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**MICHELLE MARIE PHILLIPS**,                          Case No. 6:15-CV-01603-KI

                Plaintiff,                          OPINION AND ORDER

    v.

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security**,

           Defendant.


      Katherine L. Eitenmiller
      Brent Wells
      Harder, Wells, Baron & Manning, P.C.
      474 Willamette, Suite 200
      Eugene, OR 97401

           Attorneys for Plaintiff

      Billy J. Williams
      United States Attorney
      District of Oregon

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204

Brett E. Eckelberg
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104

  Attorneys for Defendant

KING, Judge:

  Plaintiff Michelle Marie Phillips brings this action pursuant to section 205(g) of the

Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision

of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and

remand for further proceedings.

## BACKGROUND

  Phillips protectively filed applications for DIB and a period of disability on March 31,

2011 and for SSI on August 5, 2011.  The applications were denied initially and upon

reconsideration.  After a timely request for a hearing, Phillips, represented by counsel, appeared

and testified before an Administrative Law Judge ("ALJ") on September 11, 2013.

  On December 20, 2013, the ALJ issued a decision finding Phillips was not disabled

within the meaning of the Act and therefore not entitled to benefits.  This decision became the

final decision of the Commissioner when the Appeals Council declined to review the decision of

the ALJ on June 18, 2015.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ found Phillips met the insured status requirements through December 31, 2014, and had not engaged in substantial gainful activity since April 22, 2009, which is Phillips alleged disability onset date. Phillips had the severe impairments of major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder, but these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded Phillips has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand and carry out simple instructions. She should perform tasks with no production rate or pace work and predictable routines. She can have occasional, cursory contact with the public.

Given this RFC, the ALJ concluded Phillips could not perform any past relevant work, but she could perform other work in the national economy, such as janitor, laundry worker, and budder. As a result, the ALJ found Phillips not disabled within the meaning of the Act.

## FACTS

Phillips was 25 years old, with an associate's degree, on the date of her alleged disability onset. She had previously worked for more than four years as a mental health assistant, a job

which ended because the unit shut down.  She subsequently worked for less than a year as a recovery specialist but left because the environment was not safe.

Phillips attended the University of Oregon beginning in 2009.  She sought health care through the university health system, describing a history of depression since she was eight years old.  She had been prescribed different antidepressants over the years, but was taking Seroquel at that time.  She said it really helped with the anxiety, but she had stopped taking it every day because it was too expensive.  She reported feeling irritable, sleeping ten hours a day, with anxiety on and off.  At her initial mental health appointment in October 2009 with Cynthia Palman, M.D., Phillips appeared irritable and dysphoric, without smiling.  She became tearful when discussing treatment options.  Her eye contact was fair, and she was logical and goal-directed.  Dr. Palman gave Phillips samples of Seroquel and referred her to counseling.

Phillips appeared sad, depressed, and tearful, but not suicidal, throughout November and Dr. Palman increased her Seroquel dosage.  When Phillips sought treatment for abdominal cramping in early December, she appeared healthy and well and was smiling and relaxed.  Her mood continued to improve throughout the remainder of December and into January 2010.

Unfortunately, Phillips suffered a bout of nausea, vomiting, and diarrhea and missed a lot of school and, as a result, felt stressed and overwhelmed.  Dr. Palman prescribed Wellbutrin and increased Phillips' Seroquel dosage.  Phillips had a bad physical reaction to these prescription changes and was told to reduce her Seroquel and stop the Wellbutrin.  Her mood was negative in March 2010, reporting stress from a big paper.  She was prescribed Zoloft, but she did not notice a difference with it.  She continued to feel depressed in April, and her affect was flat and dysphoric.  In May, she shared her mood chart with Dr. Palman, which reflected depression,

anxiety and irritability at very high levels.  She was in a fairly good mood that day and put her

depression at 4.  Her doctor noted Phillips' mood continued to be dysphoric, despite rating her

mood at 4.

Phillips' care was transferred to Sue Colasurdo, M.D., in June 2010.  At that

appointment, Phillips reported high levels of anxiety, disrupted sleep, concentration problems,

and obsessive thoughts.  She reported loving her previous job until the facility closed.  Her

comments suggested inappropriate use of oxycodone, saying she liked the way it made her feel.

The only medical problems she mentioned were endometriosis and irritable bowel syndrome.

Dr. Colasurdo diagnosed major depression, generalized anxiety disorder, post-traumatic stress

disorder, and possible obsessive-compulsive disorder.  The doctor continued to prescribe Zoloft

and Seroquel.

Phillips returned to Dr. Colasurdo in September 2010; Phillips' summer had been

difficult.  She had enjoyed a visit to Japan, but experienced difficulties with family members and

money the rest of the time.  She had run out of her Zoloft two weeks before and, as a result,

things were going "terrible."  Tr. 400.  Phillips agreed to restart Zoloft.  She missed three

appointments in October and one in November.  When Phillips finally returned mid-November

2010, she was not doing well.  She was tired, was missing classes, and had dropped one of her

classes.  She was ruminating and depressed.  Her mood brightened over the course of the session.

Phillips had to miss her appointment a week later due to nausea, but she reported feeling better

since starting Zoloft regularly again.

In December 2010, Phillips was crying and tearful, but brightened over the course of the

session.  She intended to drop two classes, leaving her with one class.  Dr. Colasurdo continued

her prescriptions for Zoloft and Seroquel, and added Ativan for anxiety and sleep.  The following week Phillips reported babysitting a ten-year-old girl, which she enjoyed.  She had been in a very happy mood, but then got tearful when talking about Christmas.  Phillips called Dr. Colasurdo over the winter break; Phillips was crying so hard, she could not talk.  She calmed over the course of the conversation and was able to explain that she was concerned about picking up her prescriptions over the break.  The doctor noted Phillips "was relatively quickly able to reorganize herself and deal appropriately with the situation which is a positive step for her."  Tr. 387.

Phillips returned to school in January 2011, where she complained of IBS which worsened with stress.  She also sought care for back pain, which she said had been sporadic since high school.  Ronald Rennick, M.D., provided her with Percocet and a tapering dose of Prednisone.

The next day, Phillips reported to Dr. Colasurdo that she had received no credit for the previous term, but had only missed one class thus far that week.  She appeared tearful and depressed initially, but was calmer and smiling by the end.  Dr. Colasurdo noted significant progress had been made.

By the end of January 2011, Phillips reported to the clinic on an emergency basis and was distraught and overwhelmed; she reported taking a mixed overdose of pills the previous week.  She was missing classes, functioning poorly, and appeared tearful, sullen and angry.  The provider increased her Seroquel.  Dr. Colasurdo saw Phillips the next day.  Phillips appeared sedated, she walked slowly, and appeared to be drifting off at times.  She appeared calmer and brighter by the end of the appointment.  She missed two appointments in early February and, when she appeared on February 8 for an appointment to check her thyroid hormone, she had a

significantly flattened affect.  At her appointment with Dr. Colasurdo the next day, Phillips

appeared less sedated, although she described herself as tired.  A professor told Phillips she could

not miss any more class without it affecting her grade.  She began taking Synthroid for her

hypothyroidism.  The next day, at an appointment for an unrelated medical question, Phillips

appeared tearful and anxious.

Dr. Colasurdo called Phillips in March 2011 because she had not been to the clinic since

mid-February.  Phillips reported feeling up and down, but better able to manage things.  She had

not made it to any therapy appointments and she was not planning on taking classes next term.

The next day, at Phillips' appointment to follow-up on her hypothyroidism, she appeared

"obviously depressed."  Tr. 320.  Phillips also complained of ongoing back pain, for which Dr.

Rennick prescribed Percocet.  Phillips missed her appointment with Dr. Colasurdo at the end of

March 2011.

Phillips walked in for an appointment in early April.  Phillips told Dr. Colasurdo that she

had a boyfriend, she was going to take a year off of school, and she had back pain which was

limiting her ability to walk.  She was working with a therapist at Northwest Christian University.

Her mood had been down the last few days, but was generally a bit better.  She appeared subdued

but less dysphoric.

At her appointment that same day to discuss her back pain, she reported the Percocet

helped but the back pain remained bothersome.  Dr. Rennick referred her to physical therapy and

warned her about needing a pain specialist if she continued taking narcotics.

She failed to show for an appointment with Dr. Colasurdo.  When Phillips returned a

month later, in mid-May 2011, she appeared anxious, constricted, and tearful.  She was "all over

Page 9 - OPINION AND ORDER

the place." Tr. 369. She had stopped taking Seroquel and reduced her Zoloft, which Dr. Colasurdo thought corresponded with her deterioration. Two weeks later, she described feeling angry at her therapist, with low energy, but doing well with her boyfriend. She appeared cooperative, clear and logical, but her eyes drifted shut at times. Her mood was within a reasonable range, smiling and laughing at times. She was continued on Zoloft, Seroquel, and Ativan. At a thyroid check appointment, Phillips asked for a Percocet refill; she reported her current pain level at 2/10. She was no longer attending school. Dr. Rennick described her as pleasant woman "who does not appear to be significantly distressed." Tr. 312.

At the request of Disability Determination Services, Phillips underwent a psychodiagnostic evaluation with physician, Ryan Scott, Ph.D. Dr. Scott interviewed Phillips and reviewed some of her medical records, including those from Dr. Palman and some incomplete notes from Dr. Colasurdo. Phillips performed well on the tests, but her score on the Patient Health Questionnaire suggested "moderate to severe problems with depression." Tr. 450. Dr. Scott through Phillips' mental health issues would "interfere with her ability to maintain regular employment as she reported in the past a difficulty in attending school due to depression as well as inconsistencies at work attendance due to depression." Tr. 450.

Phillips established care at Community Health Centers in January 2012. She was out of Zoloft and she reported taking Seroquel as needed for anxiety or sleep. Her depression was not well controlled and she appeared teary and agitated. Phillips also complained of low back pain. Alison Nance, N.P., restarted Zoloft and arranged to get medical records regarding her back pain.

At the end of January, Phillips sought narcotics for back pain. When Nance noted Phillips' repeated visits to the emergency department for pain medications and told Phillips that

she would not get narcotics through the clinic, Phillips became tearful.  Nance agreed to order an

MRI and to continue to bridge psych medications.  Phillips cancelled one MRI appointment and

no-showed another and, as a result, Nance demanded that she return to the clinic in April 2012.

Phillips could walk without difficulty and get on and off the exam table without difficulty.  She

reported worsening pain in her back.  Nance also refilled Phillips' prescription for Zoloft and

increased her Zanaflex dosage.

The MRI showed some mild degeneration at L4-L5, but was within normal limits

otherwise.  Nance advised weight loss, stretches, warmth, ice, and anti-inflammatories in July

2012.  When Phillips returned in October 2012, Nance refused narcotics.  Phillips had no upper

body or neck pain; her pain was primarily in her low back and legs bilaterally.  She was told at

the ER that she could no longer get narcotics.  Nance recommended weight loss, acupuncture,

water therapy, and also gave her Ambien to help with sleep.

Phillips apparently returned to school in the winter of 2012.  She obtained a splint for left

wrist pain in November 2012, and her provider noted she looked well otherwise.  She

complained of back pain in December 2012, which flared from sitting during finals preparation.

She denied any pain to palpation.  She reported increased left-sided low back pain with straight-

leg raise.  Phillips was strongly advised to engage in physical therapy, use ice therapy, and she

was given a prescription for Percocet for breakthrough pain.  She returned two days later because

she had run out of Percocet.  She denied worsening symptoms.  She had no pain to palpation, but

increased pain down the left side with right leg raised, and described the pain as consistent with

her typical low-back flares.  She was given Flexeril and Percocet.  At her physical therapy

appointment, she was instructed on body mechanics, given a handout on exercises, and given a

Page 11 - OPINION AND ORDER

foam wedge.  Prognosis was fair.  Phillips did not show for a follow-up appointment in mid-December 2012; she said she was doing fairly well in a phone call.

The night of January 8, 2013, Phillips went to the University District Hospital for "chronic back/hip and shoulder pain" requesting pain medication.  Phillips had stopped her Zoloft.  As instructed by the hospital, the next day, Phillips called Nance's office for an appointment, but there were no openings; Phillips made a comment about a suicide attempt and hung up.  A provider from the clinic called her back; Phillips said she did not want to talk to anyone from the clinic as she could never get in to see anyone when she needed to.  She planned to go to urgent care.

She was apparently hospitalized at the Johnson Unit for active suicidal ideation, but there are no treatment records in the transcript.

Phillips cancelled physical therapy and follow-up appointments to check on her wrist pain, citing family issues.  She then cancelled her physical therapy appointment on January 30, 2013, saying she was "doing well."  Tr. 661.

Phillips returned to the university clinic in mid-February 2013 for chronic bilateral hip and leg pain, complaining of a flare-up in the last three days.  Phillips reported having been hospitalized at the Johnson Unit for suicidal ideation, which had resolved.  Phillips had a somewhat antalgic gait because of pain.  The provider gave her four Percocets.  She was also seen by a physical therapist that day.  She was treated with a TENS and given instructions on stretching; she felt incrementally better.  She had a mild antalgic gait.

When Phillips returned to the physical therapist a little over a week later, she displayed normal range of motion, normal muscle testing, normal straight leg raising, but with weak

abdominals.  She was given a home program, advised to begin a cardio program, and advised about ergonomic positions.  The next day, Nance saw Phillips, who complained of reflux and tooth pain.  Phillips was taking Geodon for her depression.

A few weeks later, Phillips returned to the university clinic complaining of back pain. She thought a recent long drive, or taking care of her 13-month old niece, may have precipitated the pain.  She planned to drop out of school.  She appeared to be in a moderate amount of pain, she was tearful, with poor insight.  She was given a prescription for Percocet at bedtime, but she was to follow up with physical therapy and a pain management appointment.  At a follow-up a few days later, she reported out of control pain, and feeling like she is at "the end of her rope." Tr. 509.  The pain was in her low back.  She was having a hard time focusing.  She was tearful and guarding her back.  She appeared very anxious.  She was given a Toradol injection and a prescription for Norco for breakthrough pain.  The next day, Nance spoke with the university clinic provider, and said it was problematic that Phillips had not tried alternative avenues such as exercise, weight loss, acupuncture, and other modalities; Nance discouraged narcotics for Phillips.

Phillips attended physical therapy on March 8, March 15, and March 18, 2013.  At the first appointment, Phillips said the injection had helped immensely, as had the stretching exercises.  At the second appointment, Phillips had not opened the email containing the home exercise program, she was crying and wanted acute care.  She was feeling better by the third appointment, with use of the TENS unit.  She was given another Toradol injection; she did not appear to be in acute pain compared to past visits.  She was denied narcotics, especially since she

had not attempted to use her TENS unit before that day and since she had not filled out her pain

management paperwork.

Phillips returned to Nance in April 2013.  Nance reiterated the negative MRI, the fact that

Phillips "basically has mechanical back pain," and that the most recent flare-up seemed to be

resolving.  Phillips was no longer going to school.  Nance noted, "She continues to suffer from

depression and does not feel like she can work or do much of any thing because of her mood and

her back pain."  Tr. 459.  Nance noted that "activity and achieving goals would help [her] mood

and likely her pain."  Tr. 458.

At the end of May 2013, Phillips consulted with James Morris, M.D., about her pain.  He

had Nance's medical records.  Phillips was engaged to be married, she was not working, and she

was just shy of having enough credits to graduate from college.  Phillips' standing and walking

was stable and functional, her range of motion was adequate, but she was positive for multiple

trigger points.  Dr. Morris diagnosed intractable lumbalgia with diffuse allodynia fibromyalgia.

He also noted a high level of anxiety and depression.  He recommended Cymbalta or Neurontin,

daily exercise, weight control, and mental health treatment; opiates should be a last resort.  He

completed a functional assessment in August 2013.

Phillips was then examined by Andrea Marshall, D.O., in October 2013.  Dr. Marshall

noted Phillips could easily transfer from the chair to the examination table, and could remove her

shoes without difficulty.  She could walk to the examination room without difficulty.  Dr.

Marshall noted some mental health signs present.  At the end of the interview, Phillips

"expressed concern over the fact that she was able to do all the physical maneuvers requested of

her and expressed that she believes that because of her ability to do these maneuvers her

diagnosis of fibromyalgia would be put in doubt.  She became very tearful as she expressed that

opinion." Tr. 760-61.  Phillips had two of 18 tender points.  Dr. Marshall thought that there were

no physical limitations on Phillips' ability to work.

Two years after Dr. Morris initially examined Phillips, the doctor responded to questions

put to him by Phillips' attorney regarding his diagnosis of fibromyalgia, and his related opinion

about her functional limitations.

**DISCUSSION**

Phillips challenges the ALJ's decision on three grounds:  her assessment of Dr. Morris'

opinion, her failure to consider fibromyalgia as a severe impairment and the cascading effect of

that decision, and her failure to account for Phillips' mental health impairments.

I.      Dr. Morris' Opinion

The ALJ concluded Dr. Morris' opinion was not entitled to any weight, resulting in a

finding that fibromyalgia was not a severe impairment.  The ALJ considered Dr. Morris'

functional assessment to be a "check-the-box" form, and concluded he failed to support his

opined limitations with evidence.  She noted his limited treatment of Phillips, and viewed the

functional restrictions to be inconsistent with the doctor's treatment notes and with Dr.

Marshall's examination findings.  The ALJ also pointed out the diagnosis was made in May 2013

and, as a result, did not meet the continuous 12-month criteria.

Phillips contends the ALJ erred in the weight he gave Dr. Morris' opinion.  According to

Phillips, Dr. Morris' findings constitute objective evidence of a diagnosis of fibromyalgia and

support limitations to sitting about four hours, and standing/walking about two hours, as well as

lifting and postural limitations.  Dr. Morris also concluded Phillips would be absent from work more than twice per month.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.

As an initial matter, Phillips contends the ALJ erred in finding Dr. Morris' opinion to be inconsistent with his treating notes.  I note that while the ALJ is not explicit, she did include a complete medical history of Phillips' tests and treatment.  Specifically, she referenced Dr. Morris' finding that Phillips standing and walking were "stable and functional," which was inconsistent with the doctor's standing/walking limitation.  Tr. 30 (citing Tr. 739).  Additionally, just before Dr. Morris examined Phillips, Phillips demonstrated normal range of motion, muscle testing, straight leg raising, hip compression, with weak abdominals and tenderness along the iliac crest bilaterally.  Tr. 30 (citing Tr. 657).  Further, the ALJ noted Phillips' pain appeared to

be related to her increase in activity, such as lifting her 13-month-old niece.  Tr. 31.  These

factual findings are sufficient to meet the ALJ's burden.  *See Thomas v. Barnhart*, 278 F.3d 947,

957 (9th Cir. 2002) (ALJ may meet burden by "setting out a detailed and thorough summary of

the facts and conflicting clinical evidence, stating his interpretation thereof, and making

findings.").

Dr. Marshall's opinion is also striking in its contradiction to Dr. Morris' opinion.  While

Dr. Morris found 17 of 18 fibromyalgia points, Dr. Marshall noted only two of 18 trigger points.

In order to meet the regulatory criteria for fibromyalgia, a claimant must have tenderness in 11 of

18 points.  SSR 12-2p, *available at* 2012 WL 3017612, at *43641.  Dr. Marshall's examination

of Phillips' physical capacity was also inconsistent with Dr. Morris' opinion.  For example, Dr.

Marshall's opinion was based on Phillips' successful performance of several physical maneuvers,

and there is no indication in Dr. Morris' check-the-box form, or in his accompanying opinion, as

to what "evidence" he relied on (other than the trigger points) to assess Phillips' functional

limitations.  *See* Tr. 27.

In the end, "[w]hen there is conflicting medical evidence, the [ALJ] must determine

credibility and resolve the conflict."  *Thomas*, 278 F.3d at 957.  Here, the ALJ relied on Dr.

Marshall's observations of Phillips' physical capabilities, which was consistent with other

normal findings in the chart notations.  Tr. 30-31.  The ALJ did not err.

II.     New Evidence

The ALJ also noted that Dr. Morris' opinion did not support the notion that any

fibromyalgia was an impairment lasting 12 continuous months, as required by law.  Tr. 27; *see*

20 C.F.R. §§ 404.1505(a), 416.905(a).  However, Dr. Morris submitted a supplemental opinion

to the Appeals Council two years after his initial opinion.  The Appeals Council found no reason

to change the ALJ's decision and declined to review the decision.

Additional evidence presented to the Appeals Council but not seen by the ALJ may be

considered in determining if the ALJ's denial of benefits is supported by substantial evidence.

*Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000).  The court may not hold on the basis of the

additional evidence, however, that the claimant is entitled to an immediate award of benefits.

The case must be remanded to the ALJ for consideration of the new evidence, rebuttal by the

Commissioner, and any additional testimony needed because of the new evidence.  *Id; but see*

*Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1162-63 (9th Cir. 2012) (remanding for a finding

of disability).  The question is "whether, in light of the record as a whole, the ALJ's decision was

supported by substantial evidence and was free of legal error."  *Taylor v. Comm'r of Soc. Sec.*

*Admin.*, 659 F.3d 1228, 1232 (9th Cir. 2011) (citing *Ramirez v. Shalala*, 8 F.3d 1449, 1451-54 (9th

Cir. 1993)).

I agree with the Commissioner that Dr. Morris' letter does not undermine the substantial

evidence supporting the ALJ's decision since it is "unpersuasive retrospective speculation[.]"

Def.'s Br. 12.  The Commissioner notes that Dr. Morris appears to infer from symptoms Phillips

reported as far back as her teenage years that Phillips suffered from fibromyalgia before May

2013, but he had no direct knowledge of Phillips' level of impairment prior to May 2013.  In

order to infer that Phillips' condition had persisted for two years, the doctor needed to rely on her

reporting, which the ALJ found unreliable--a finding Phillips did not challenge.  The only past

medical record the doctor referenced is a 2006 hospital admission, which is not in the transcript.

Phillips' medical records do not reflect the diffuse allodynia until Dr. Morris' examination of her

in May 2013.  Rather, she regularly complained only of back pain.  Finally, as the ALJ noted, Phillips' complaints of pain are drawn into question by her drug-seeking behaviors.

Dr. Morris' 2015 letter does not undermine the substantial evidence supporting the ALJ's determination that fibromyalgia was not a severe impairment.

III.    <u>Mental Health Impairment</u>

Finally, Phillips argues the ALJ did not account for all of her mental health impairments in the RFC and improperly rejected Dr. Scott's opinion that she would have difficulty working due to her mental health impairments.  Instead, the ALJ relied on the agency consultant opinions from October 2011 and March 2012.  Tr. 31.

The ALJ did not give specific and legitimate reasons to reject Dr. Scott's opinion that Phillips "mental health issues [would] interfere with her ability to maintain regular employment[.]"  Tr. 32.  While it is true that Dr. Scott referenced Phillips' "reports" of difficulty attending school and work due to depression, and Phillips has not challenged the ALJ's credibility determination, Dr. Scott's observation is supported by ample evidence in the record. Phillips' treatment records reflect Phillips was irritable, fatigued, anxious, tearful, and dysphoric. She missed doctor appointments and classes in the fall and winter of 2010, and received no credit for the term.  She attempted an overdose in January 2011, missed doctor appointments throughout the spring of 2011, and she stopped attending school.  This pattern continued after Dr. Scott's examination of Phillips.  Phillips missed MRI appointments in March 2012.  While she appeared to stabilize in the fall of 2012, she was hospitalized in January 2013 with suicidal ideation.  She was no longer going to school by April 2013.  Even Dr. Marshall noted "mental

health signs present" and thought Phillips might benefit from a mental health evaluation.  Tr.

760.

The ALJ does not explain how Phillips' performance on testing undermines a conclusion

that she would be absent from work due to mental health symptoms.

Finally, the ALJ thought partial weight was appropriate given Dr. Scott's single visit with

Phillips, but she relied on the opinions of two consulting physicians who had not met with

Phillips at all.  Further, as I note above, Dr. Scott's opinion is supported by the longitudinal

record.

Substantial evidence supports Dr. Scott's concern about the likelihood Phillips would

miss workdays.  Hypothetical questions posed to a vocational expert must specify all of the

limitations and restrictions of the claimant.  *Edlund v. Massanari*, 253 F.3d 1152, 1160 (9th Cir.

2001).  If the hypothetical does not contain all of the claimant's limitations, the expert's

testimony has no evidentiary value to support a finding that the claimant can perform jobs in the

national economy.  *Id.*  Here, the ALJ's hypothetical did not include reference to absenteeism,

but when asked by Phillips' counsel the VE testified that employers typically tolerate one

absence per month.  Tr. 76.

IV.     Remedy

The court has the discretion to remand the case for additional evidence and findings or to

award benefits.  *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  The court has

discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally

sufficient reasons for rejecting the evidence, there are no issues to be resolved before a

determination of disability can be made, and it is clear from the record that the ALJ would be

required to find the claimant disabled if the evidence is credited. *Garrison v. Colvin*, 759 F.3d

995, 1020 (9th Cir. 2014). Alternatively, the court can remand for further proceedings "when the

record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the

meaning of the Social Security Act." *Id.* at 1021.

The ALJ's finding that Phillips had the capacity to perform other work in the national

economy was premised on her improper rejection of Dr. Scott's opinion on the likelihood of

Phillips absenteeism due to depression. As a result, the ALJ's conclusion is not supported by

substantial evidence. Fully crediting Dr. Scott's opinion that Phillips' mental impairments would

impact her ability to sustain regular employment, along with the VE testimony that missing one

day a month would interfere with employment, means that a finding of disability on remand is

required.

A remand for an award of benefits is an option. However, while it is clear Phillips'

mental impairments caused her to become disabled at some point prior to her date last insured, it

is not clear to me that she is entitled to ongoing disability benefits; rather, benefits for a "closed"

period of disability may be more appropriate. Specifically, as the Commissioner points out,

Phillips did not challenge the ALJ's credibility assessment. In that assessment, the ALJ pointed

out that Phillips had worked prior to attending school. She left her jobs for reasons other than

her mental impairments. She admitted in May 2010 that the level of her mental distress was

connected to her school work. Her treating provider, Nance, noted in April 2013 that activity and

working toward a goal would likely improve Phillips' mood, as well as her pain. Thus, based on

this record, the most appropriate course of action is reversal for further development of the

record, including a decision as to the beginning and end dates of at least a closed period of

disability.  *See, e.g. Howell v. Astrue*, 248 F. App'x 797 (9th Cir. 2007) (unpublished).

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for further development of the record

as explained above.  Judgment will be entered.

IT IS SO ORDERED.

DATED this ____9th____ day of November, 2016.


                            __/s/ Garr M. King_____
                            Garr M. King
                            United States District Judge

Page 22 - OPINION AND ORDER